Law Offices of Melvin J. Kalish
114 Old Country Road
Mineola, New York 11501
Melvin J. Kalish (MK 2506)
Joshua D. Spitalnik (JS 5893)
(516) 746-3000
(516) 746-3079 (facsimile)
mk@mjkalishlaw.com
Attorneys for Defendants
Schlesinger Electrical Contractors, Inc.
and Jacob Levita

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------x

FIRST KEYSTONE CONSULTANTS, INC.,
ROBERT H. SOLOMON and JANE SOLOMON,

                                        Plaintiffs,

                                                                    Docket No. 10-cv-0696 (KAM)

                    -against-

SCHLESINGER ELECTRICAL CONTRACTORS,
INC., JACOB LEVITA, and JPMORGAN
CHASE & CO.,

                                        Defendants.

----------------------------------------------------------------x

## REPLY DECLARATION OF MELVIN J. KALISH IN
## FURTHER SUPPORT OF MOTION FOR PROTECTIVE ORDER

1.    I am a principal of the Law Offices of Melvin J. Kalish, attorneys of record for

Defendants, Schlesinger Electrical Contractors, Inc. and Jacob Levita (sometimes collectively

referred to herein as "Schlesinger Defendants" or "SEC" or "Schlesinger"). I am fully familiar

with the facts and circumstances set forth herein.

2.    I respectfully submit this Reply Declaration in response to the opposition papers

of Plaintiffs and in further support of the Motion of Schlesinger and Levita for a Protective Order

pursuant to Rule 26(c) striking numerous requests made by Plaintiffs First Keystone Consultants,

Inc., Robert Solomon and Jane Solomon (collectively referred to herein as "Keystone") in their Notice of Request for Discovery and Inspection of Documents dated June 30, 2010 on the grounds that such requests are not relevant to the claims or defenses in the instant action and are designed solely for the purposes of annoyance, oppression and creating undue burden and expense to Schlesinger.

## I. KEYSTONE MAY NOT SEEK DOCUMENTS WHICH MAY BE RELEVANT IN ANOTHER LAWSUIT BUT ARE NOT RELEVANT TO THE INSTANT ACTION

3.      Schlesinger has made a substantial production of documents in the instant action consisting of approximately 850-900 pages. Keystone is not entitled to any additional documents.

4.      Keystone does not deny that there is a lawsuit pending in Supreme Court, Queens County, which has been actively litigated since 2005 entitled First Keystone Consultants Inc., et al. v. DDR Construction Services, et al., Index No. 27095/05. Keystone does not deny that as late as approximately January 2009, Schlesinger amended its pleadings to seek recovery of substantial monies due from Keystone and the Solomons. Keystone followed suit and amended its pleadings to assert various claims against Schlesinger. The operative pleadings in that case consist of approximately 503 pages!

5.      It is beyond dispute that the Queens County Action deals with all potential disputes between Keystone and Schlesinger pertaining to the LLC projects. Therefore, one is compelled to inquire: What possible reason exists which would justify Keystone's decision in 2010 -- while the Queens County was (and is) still pending -- to go to this Federal Court and initiate a brand new action against Schlesinger relating to the very LLC projects which are the subject of the Queens County Action? The answer is there is no justification whatsoever. The

2

only reason Keystone initiated the instant lawsuit was the misguided belief that as a "Plaintiff" it could sufficiently harass Schlesinger into suspending its effort to recover its Judgment ($582,617.03 as of August 18, 2010) against Keystone. The timing is crystal clear. Schlesinger's Judgment was entered on January 6, 2010. Keystone initiated the instant action on February 17, 2010.

      6.     It is well-settled that a party may not maintain two lawsuits in different courts for the same relief. That is why Schlesinger raised in its Answer as Third and Fourth Affirmative Defenses the prior action pending in Queens County and the prior action pending in Nassau County, which was transferred to Queens County and then discontinued with prejudice. By belatedly starting a new action in Federal Court in 2010, Keystone is also engaging in improper forum shopping.

      7.     We submit that Keystone may not seek discovery pertaining to claims and defenses being asserted in other Courts. Yet, that is precisely what Keystone is seeking to do.

## II.   AN ACCOUNTING IS SCHEDULED TO BE CONDUCTED IN THE QUEENS COUNTY ACTION

      8.     In the Queens County Action, the parties have made requests for dissolution and an accounting. By court order, an accounting is scheduled to be performed in that action by a referee. Queens County Supreme Court is in the process of selecting a referee. As noted, the issues surrounding the profitability of the SFD Associates Joint Venture are being fully addressed in the Queens County Action.

### IIII.   PLAINTIFFS ADMIT THAT THEIR DISCOVERY DEMANDS SEEK DOCUMENTS RELATED TO THE DAY-TO-DAY OPERATIONS OF SSE-LLC AND SCHLESINGER BUT FAIL TO SHOW HOW THESE DOCUMENTS RELATE TO THIS ACTION

9.      In their opposition papers, Plaintiffs fail to provide any evidence to dispute Schlesinger's central position that the claims and defenses in the instant action are unrelated to the day-to-day operations and/or profitability of Schlesinger-Siemens Electrical LLC, SFD Associates, or Schlesinger Electrical Contractors, Inc. (see, e.g., 8/16/10 Kalish Dec. ¶¶ 38 – 41).

10.      Plaintiffs further failed to address Schlesinger's argument that their discovery demands are designed to obtain documents and information relevant to the Queens County Action (a case which does deal with the day-to-day operations of the entities in question) (see, e.g., 8/16/10 Kalish Dec. ¶¶ 49 – 54).

11.      Rather than rebut these points, Plaintiffs actually admit that the vast majority of their demands seek information relating to the operation and profitability of the LLC, including Request Nos. 3, 4, 5, 6, 11, 13, 17, 23, 24, 28, 29, 33, 34, 35, and 36.[1]

12.      There can be no dispute that the Queens County Action (and only the Queens County Action) relates to the day-to-day operations and profitability of SFD Associates and SSE-LLC, and that there are substantial claims between Schlesinger and Keystone and their principals which include, *inter alia*, causes of action for an accounting and dissolution of SFD Associates.

13.      It would be oppressive, unduly burdensome and expensive to require Schlesinger to produce tens of thousands of pages of documents relating to the day-to-day operations and

---

[1] Notably, Schlesinger's review of Plaintiffs Request reveals that Request Nos. 1, 2, 3, 4, 5, 6, 11, 12, 13, 14, 15, 16, 17, 19, 21, 23, 24, 25, 26, 27, 28, 29, 33, 34, 35, 37 and 40 seek information relating to the day-to day operations and profitability of the venture.

profitability of the above named entities since the information sought clearly relates to other litigations and not the instant litigation.

**IV.  PLAINTIFFS DO NOT DISPUTE
THAT THEY SEEK DOCUMENTS RELATING TO
MATTERS THAT WERE DISCONTINUED WITH PREJUDICE**

14.     As previously stated in Schlesinger's moving papers, Keystone previously commenced a Supreme Court, Nassau County Action entitled <u>First Keystone Consultants, Inc. v. Schlesinger Electrical Contractors, Inc., et. al.</u>, Index No. 022828/07, which dealt with claims relating to the <u>December 14, 2007</u> vote of the SSE-LLC Board of Managers to remove Keystone/Solomon from a managerial position due to his mismanagement, issuance of "sweetheart contracts" without bidding, etc. (*see, e.g.,* 8/16/10 Kalish Dec. ¶¶ 44 – 48).  The Nassau County Action was consolidated with the Queens County Action.  The action was then <u>discontinued with prejudice</u>.

15.     Despite Schlesinger expending substantial time and money defending and eventually forcing the discontinuance with prejudice, Plaintiffs continue to seek documents and raise the subject matter of its claims in the discontinued Nassau County Action.

16.     For example, Plaintiffs' counsel asserts his demands seek documents "regarding the vote that took place at the December 14, 2007 meeting of the Board of Managers [since it] is intended to show the events leading up to that meeting and any reasons therefore" (Agins Dec. ¶40).  Further in Paragraph 21 of the Agins Declaration, Plaintiffs continue to claim that "Mr. Levita voted Mr. Solomon out of management in direct violation of the SFD Agreement."

17.     If Plaintiffs believed that they had a legitimate claim or cause of action regarding the December 2007 Board of Managers Resolution (which they do not), they never would have

5

discontinued their Nassau County Action <u>with prejudice</u>. However, after discontinuing the

action with prejudice, Plaintiffs cannot years later seek to re-litigate these claims.

18.     Notably, in Plaintiffs' transparent attempts to gain the sympathy of the Court

regarding the December 2007 SSE LLC resolution to reorganize management, Plaintiffs fail to

apprise the Court that Siemens (and not Schlesinger) conducted an independent audit and

determined that there were numerous problems regarding Solomon's management of the LLC

(Exhibit "A").

**V.     PLAINTIFFS IMPROPERLY SEEK PROPRIETARY
INFORMATION RELATING TO SCHLESINGER BUSINESS
HAVING NOTHING TO DO WITH THE PARTIES' JOINT VENTURE**

19.     Pursuant to the Joint Venture Agreements entered into between Schlesinger and

Keystone, the parties specifically agreed that each party can carry on separate business for its

sole benefit. Despite the clear language in the agreement, Plaintiffs now improperly seek

Schlesinger's proprietary information relating to the other business conducted by Schlesinger.

20.     Paragraph 1 of the SFD Associates Joint Venture Agreement provides:

> 1. SCOPE OF AGREEMENT. The parties hereto constitute themselves as
> Ventures [*sic*] <u>solely for the purpose of preparing and submitting bids and
> performing and completing the Principal Contract</u> and any other work performed
> at the site of the Principal Contract, but for no other purpose, it being understood
> that as Ventures the parties are not making any arrangement to perform any work
> jointly except that specifically encompassed within this agreement and that <u>each
> party may carry on its separate business for its sole benefit</u>.

Exhibit "B" (emphasis added).[2]

21.     This language clearly permits Schlesinger (and Keystone) to conduct business

independent of one another and for its own benefit. Despite this provision, Plaintiffs' Request

improperly seeks a review of <u>all</u> of Schlesinger's records, regardless of whether the records relate

---

[2] Exhibit "B" contains an excerpt of one of the SFD JV Agreements. Each JV Agreement contains the
same excerpted language.

to Joint Venture work. These requests include Request Nos. 14, 15, 21, 22, 26, 27, 28, 34, and 35.[3]

22.     Schlesinger's business records dealing with projects unrelated to the SFD JV are proprietary and clearly unrelated to any claims, causes of actions or defenses that can be raised by Plaintiffs. Plaintiffs are seeking these records in bad faith for the purposes of annoyance, embarrassment, oppression, and the undue burden and expense to Schlesinger, warranting a Protective Order under Rule 26(c).

## VI.     ADDITIONAL REASONS WHY A PROTECTIVE ORDER SHOULD BE GRANTED

We respectfully submit that the above circumstances warrant the issuance of a protective order. However, we wish to point out additional grounds which justify the granting of Schlesinger's Motion.

### A.     Plaintiffs' demands are over broad

23.     In a transparent attempt to justify their over broad and burdensome discovery demands, Plaintiffs claim that they are entitled to countless pages of irrelevant information in order to find the proverbial "needle in a haystack".

24.     For example, in Paragraph 27 of Plaintiffs' opposition papers, Plaintiffs attempt to justify their Request No. 17 seeking <u>all correspondence</u> between Schlesinger and SSE LLC, SE&A and SII from <u>January 2005 until the present</u> in order to find documents relating to the narrow issue of labor overruns.

---

[3] As previously stated in Schlesinger's moving papers, Request Nos. 4, 15, 22, and 36 also deal with companies and/or individuals for which there are no cognizable causes of action and are not parties to the SFD JV Agreement, including *inter alia* "Schlesinger Realty" and the "Levita family" (*see, e.g.* 8/16/10 Kalish Dec. ¶¶ 42 – 43).

25.     Notably, a simple review of Request No. 17 demonstrates that at no time does the request ever use the words "labor overrun." Rather, this is an 11th hour excuse to support what is a clearly inappropriate and over broad discovery demand.

26.     Further, in a contrived attempt to justify Request No. 13 seeking all correspondence between SSE LLC and the DEP from January 2005 to the present, Plaintiffs now claim that they are purportedly seeking information relating to favorable performance ratings (*see,* Agins Dec. ¶25). However, the production of all correspondence for this five (5) year time period will clearly require the production of mountains of documentation having nothing to do with performance ratings.

27.     A review of Plaintiffs' opposition papers reveals that Plaintiffs' Request Nos. 1, 2, 4, 12, 13, 17, 23 and 24 are each patently over broad since they seek all documents (consisting of thousands of pages of documents) in order to find these "needles in the haystack."[4]

28.     Plaintiffs' overbroad document demand is part and parcel of Plaintiffs' strategy to harass Schlesinger, and clearly warrants the issuance of a Protective Order.

**B.      Plaintiffs' request for a "listing" of information is an improper document request**

29.     In responding to a Demand for Discovery and Inspection, a party should not be required to create a document in order to satisfy a request from the other side. However, that is exactly what Plaintiffs are requesting Schlesinger to do.

30.     For example, according to Plaintiffs' Opposition papers, Plaintiffs contend that some of their requests "require merely a listing of information: ¶¶ 14, 15, 16, 17, 19, 30, 31, 32, 33 and 35." (Agins Dec. ¶9). In addition to the requests for a listing of information identified by Plaintiffs, Request Nos. 2 and 3 also seek a "listing" of information.

---

[4] Schlesinger reiterates its opposition to the production of these categories of documents since they are unrelated to the instant action.

31.    Said requests for a "listing" of information are improper in a Demand for Discovery and Inspection.

## C.    Plaintiffs are improperly conducting a "fishing expedition" in order to harass Schlesinger

32.    Plaintiffs' opposition papers reveal that Plaintiffs' are merely conducting a "fishing expedition" to harass and embarrass Schlesinger.  Further, as a purported "justification" for these requests, Plaintiffs make wild allegations without any basis for their claims.

33.    For example, in Request No. 5, Plaintiffs improperly seek documents evidencing all compensation to any employee or independent contractor of Schlesinger, claiming that such documents relate "to Plaintiffs' concern, based on their past dealing with the Schlesinger Defendants, of commingling of funds and ...improper allocation of expenses" (Agins Dec. ¶ 20). Notably, during the Arbitration between Schlesinger and Keystone which resulted in the January 6, 2010 Judgment against Keystone, Keystone raised this purported "commingling" and "improper allocation of expenses" argument.  After six (6) full days of hearings, a three member AAA Panel determined that Schlesinger's figures were accurate (i.e. there was no commingling or improper allocation). [5]  Significantly, the panel also ruled that <u>Keystone breached its fiduciary duty to Schlesinger</u>.  Despite the Award against Keystone, Keystone now attempts to deceive this Court by raising the same specious claim of "commingling" previously raised and rejected.

34.    Further, in Request No. 4, Plaintiffs request all documents evidencing all compensation from SSE LLC to any members of the Levita family or any SEC affiliate, with the claim that "Plaintiffs seek information as to whether there are persons on the payroll of whom they are unaware" (Agins Dec. ¶19).  By Plaintiffs' own statement, they are <u>unaware</u> of any payment to these unrelated entities and therefore there is no basis for making such a demand

---

[5] There were minor offsets awarded to Keystone.

9

other than to harass Schlesinger.  More important, there are no claims, allegations or causes of action against Levita family members or SEC affiliates, if any.

35.      Additionally, in Request Nos. 28, 29, 33, 34, 35 and 36, Plaintiffs seeking a wide variety of information relating to any purported problems with the labor union and purported problems regarding the electrical license held by SSE LLC.  There is no legitimate purpose for requesting these documents other than to harass Schlesinger.

**D.     Plaintiffs' opposition papers argue for the production of documents already produced by Schlesinger**

36.      In this action, Schlesinger has made a substantial production of documents to Plaintiffs.  However, despite this production, Plaintiffs' opposition papers argue for the production of documents which have already been produced by Schlesinger.

37.      To the extent the request was not vague, ambiguous or misleading, Schlesinger has produced responsive documents to Requests Nos. 16 and 20, which were annexed as Exhibit "D" to Schlesinger's Response.

<strong>CONCLUSION</strong>

38.      Based on the foregoing, the Schlesinger Defendants respectfully request that the Court issue a Protective Order with respect to those requests which are the subject of this Motion.

I declare under the penalty of perjury that the foregoing is true and correct.  Executed on this 13th day of September, 2010.

MELVIN J. KALISH (mk2506)

10

**EXHIBIT A**

**SIEMENS**

Confidential – Subject to Attorney Client Privilege

**SE&A Internal Audit**

**Date:** June 23, 2008

**To:** M. Williamson

**From:** B. O'Donnell

**Cc:** See Distribution

**Subject:** Final Audit Report

In accordance with the Audit Announcement Letter dated February 25, 2008, Siemens Energy & Automation (SE&A) Internal Audit conducted a financial audit of the projects recorded on the books of Schlesinger-Siemens LLC. The purpose of our work was to ensure that project purchases have been properly authorized, are in accordance to project plans and have been recorded accurately and timely. The scope of the audit included the transactions for projects in effect between January 1, 2007 and December 31, 2007. The audit fieldwork was conducted between March 3 and March 21, 2008. As a result of our work we noted several areas where further improvement in policies and procedures would be required:

**Lack of Adequate Internal Controls in the Accounting, Purchasing and Accounts Payable Processes**

We found a general lack of internal controls in the accounting, purchasing and accounts payable processes. The primary issue is the lack of segregation of duties exercised by Bob Solomon, a member of the LLC Board of Managers, Joe Guddemi who performs the accounting function and Tom Bell, the purchasing manager. However, there are many other internal control issues including inadequate authorizations. Following are examples of the issues we found:

1. No approval on some invoices for professional services
2. POs are type written using Excel and signature of approval is typed, not handwritten
3. Mr. Bell approves many invoices for which he places the orders
4. In many cases the approver of POs also does the receiving approval and invoice approval for payment
5. POs sometime list the material being ordered without the price or value of the line items
6. Some invoices are approved for payment after the invoice has already been paid
7. Some invoices are issued, approved and paid on the same day
8. A few invoices refer to POs which could not be found
9. Invoices were paid for quantities of merchandise which were greater than the quantities on the POs
10. A few invoices do not show any PO numbers and it is impossible to determine if they are covered under a contract
11. We found several apparent examples of payment of duplicate invoices
12. Sales tax liabilities have been incurred without being accrued and without filing use tax returns with the tax authorities.

SIEMENS                                                    **SE&A Internal Audit**

Confidential – Subject to Attorney Client Privilege

**Conflict of Interest between First Keystone Consultants and Robert Solomon**
First Keystone Consultants, Inc is the private service company owned by Mr. Solomon. First
Keystone invoices the LLC for a variety of services including for the services of Mr. Solomon to
act as the Operations Manager of the LLC. We found several instances where the only
approval for payment of First Keystone invoices was made by Mr. Solomon. Examples include
the following:

1. Mr. Solomon approves invoices for his services as Operations Manager
2. There were several instances where cement delivered to job sites was paid by First
   Keystone. This process deviates from the normal process for expenses incurred by the
   LLC. The normal process is for one of the LLC partners (either Schlesinger or SE&A) to
   contract with a supplier, and for the supplier to invoice them. They would pay the
   supplier and then invoice the LLC. In the case of Ferrara Brothers Cement, First
   Keystone is paying them (or claiming to have paid them) for cement delivered to LLC
   jobs. The only evidence of payment that First Keystone is supplying is photo-copies of
   the front of checks. Since Ferrara Brothers did not contract with one of the LLC
   partners, there are no purchase orders involved, and there are no invoices from Ferrara
   Brothers. There is also no evidence that cement was actually delivered. Again, Mr.
   Solomon approves the invoices issued by First Keystone.
3. Mr. Solomon approves invoices for his expense reports as well as those of his son, an
   independent contractor for the LLC.


**Lack of Transparency into Project Expenses**
In many cases the project costs were misclassified in the accounting records. This precludes
any effective analysis of project costs against budgets because the reporting of actual costs is
not transparent. Examples include the following:

1. Numerous invoices from Schlesinger to the LLC (compiled by Mr. Guddemi) incorrectly
   classify miscellaneous expenses as materials. All of the Schlesinger charges classified
   as materials on their weekly invoice are classified in SAP as "Merchandise". In reality,
   virtually none of those charges were materials.
2. All of the Siemens charges for the electrical apparatus charged to the LLC are classified
   in SAP as "Contract processing/installation/other", in spite of the fact that about $4
   million was hardware.
3. Detail level budgets are not being prepared prior to bidding a project and in at least one
   case, do not exist even after work has begun on the contract. This detail level budget is
   what the customer uses to approve payment to the LLC for progress on the project and
   without this documentation, the LLC cannot collect payment.
4. The 26th Ward project is running over budget, with materials apparently being over
   budget by double. There is no analysis to explain this.
5. J&R Rey (one of our minority contractors) bills the LLC for materials without supporting
   documentation. The contract with J&R Rey calls for time and material billing, with a
   mark-up. The LLC cannot determine if materials were purchased, who they were
   purchased from, at what price they were purchased, nor that the materials were required
   by the project.

**SIEMENS**

SE&A Internal Audit

Confidential – Subject to Attorney Client Privilege

**Lack of Compliance Controls**
The general lack of internal controls within the LLC has resulted in an additional risk related to compliance issues.  As stated above, actual costs are often lumped together and misclassified. This results in the inability to see what types of expenditures are occurring by reviewing the financial records.  In addition, many payments are made with little or no oversight with respect to approvals.  There have been very few HR controls in place, allowing Mr. Solomon to assemble a staff of friends and family to operate and administer the LLC.  There have been clear cases where conflicts of interest have been allowed to occur.  Mr. Solomon has been able to spend LLC funds, as well as to write and approve contracts with no oversight, committing the LLC, and therefore Siemens, to long-term arrangements Siemens might not have approved had they had the opportunity.  Examples of resulting issues include:

1. Mr. Guddemi has a 5 year contract with the LLC with an automatic extension of 2 years if the LLC is still doing any business with any agency of the City of New York. The contract details a $100/day/year escalation clause for each year of the contract. The pay rate was$800/day in 2007 ($208k/yr) and will be $1,200/day by 2011 ($312k/yr), and could escalate to $1,400/day by 2014 ($356k yr).  This contract does not address his duties.
2. Mr. Guddemi is also performing an accounting function for and collecting money from at least one of the LLC's vendors, which is a conflict of interest.
3. There was a reimbursement to Mr. Guddemi for $15,000 worth of 4 season tickets to the Mets and Diamond club memberships for four, all approved by Mr. Solomon.
4. There was a reimbursement to Mr. Guddemi for coffee delivered to his personal residence (it is possible that he could have brought it to the office).
5. The lack of controls around the purchasing process has allowed Mr. Solomon and Mr. Bell to select venders on their own, generally choosing vendors with whom they have long-term relationships without going through a selection process including quotes from multiple vendors.

Additionally, the lack of controls described above makes it extremely difficult to prevent or detect whether any payments made by the LLC were used for any improper activities, including any activities to secure business.  However, we found no direct evidence that any such activities occurred.  Additionally, we found no evidence that any public funds were ever at risk.

**Recommendations**
Management of the LLC must design and implement an effective internal control system in order to ensure the following:

1. All transactions executed by the LLC have received adequate review and pre-approval. This includes committing to contracts of any type, entering into purchase agreements including POs and making payments.
2. All financial transactions are fully and accurately recorded in the financial records.
3. No funds expended by the LLC are used in a way that violates any laws, regulations or tax codes.

LLC management must install a local management team capable of designing, implementing and executing such a system.

We wish to thank the management and staff of Schlesinger-Siemens for their cooperation and support during the course of this audit.

3

**SIEMENS**

Confidential – Subject to Attorney Client Privilege

**Distribution:**

D. Sadlowski
H. Volande
M. Troy
D. Taft
J. Eder
F. Krutemeier
R. Dung
M. Taylor
C. Trocina

4

**EXHIBIT B**

PRE—BIDDING
AND
JOINT VENTURE AGREEMENT
OF SFD ASSOCIATES

THIS AGREEMENT was made and entered into, effective this 3l
day of October 2006, between the following parties:

(1)   Schlesinger Electrical Contractors, Inc. ("Schlesinger")
      664 Bergen Street, Brooklyn, New York  11238

(2)   First Keystone Consultants, Inc. ("FKC")
      1629 SE Ballantine Blvd., Port St. Lucie, FL  34952

(Hereinafter collectively the "Ventures")

WITNESSETH:

WHEREAS the Ventures have been declared by the City of New York
as the low bidder on the contracts known as Croton Water
Treatment Plant located at Van Cortlandt Park : Contract CRO
312E-1 in the amount of $134,680,00 and Contract CRO 312E-2 in
the amount of $37,678,000 (together the "Croton Contracts"). The
terms and conditions of this Agreement shall be applicable to
the Croton Contracts.

WHEREAS the term Principal Contract used herein shall include
the Croton Contracts and additional Principal Contracts as may
be added by Rider to this Agreement.

WHEREAS this Agreement supercedes and replaces the Joint Venture
Agreement, dated August 20, 2004 and all Riders, addenda and
modifications thereto.

WHEREAS the Ventures have agreed to prepare and submit bid
proposals for the Principal Contract and any other work obtained
at the site of the Principal Contract and any other work
obtained at the site of the Principal Contract in the amounts
and upon terms to be mutually agreed upon by the Ventures prior
to the submission thereof; and

WHEREAS the parties to this agreement desire to set forth their
rights and interests in and their duties and obligations under
the Principal Contracts which may be awarded as a result of the
foregoing bid or proposal:

NOW, THEREFORE, in consideration of the mutual covenants hereinafter set forth, the parties hereby agree to constitute themselves as Ventures for the purpose of (1) preparing and submitting a bid and (2) performing and completing the Principal Contract, upon the following terms and subject to the following conditions:

1.  SCOPE OF AGREEMENT. The parties hereto constitute themselves as Ventures solely for the purpose of preparing and submitting bids and performing and completing the Principal Contract and any other work performed at the site of the Principal Contract, but for no other purpose, it being understood that as Ventures the parties are not making any arrangement to perform any work jointly except that specifically encompassed within this agreement and that each party may carry on its separate business for its sole benefit.

2.  PARTIES TO BID. The bid or proposal shall be submitted in the name of Schlesinger-Siemens, LLC for the benefit of the Joint Venture or as hereinafter agreed, provided, however, that no bid or proposal shall be submitted naming any one of the Joint Ventures or any party on behalf of the Joint Ventures as one of the Joint Ventures unless that party shall have agreed to the amount and to all the terms of the bid or proposal.

3.  RIDER TO AGREEMENT. Prior to the submission of each bid the parties hereto will sign a rider to this agreement which will set forth the specific terms and conditions under which the Joint Venture and the parties hereto will undertake the performance of the principal contract if it is awarded to the Joint Venture.

4A.  RIGHT TO WITHDRAW OF CHANGE. Prior to the submission of the bid or proposal, any party may withdraw from the Agreement and thereby terminate all of its duties and obligations hereunder. After a bid or proposal has been submitted, no change shall be made therein unless such change shall be consented to by all parties.

4B.  DUTIES ON AWARDED PRINCIPAL CONTRACT. The Ventures shall have joint and several liability as to the Principal Contract, and shall take and continue to take such other steps as the Owner may require to make the Principal Contract a legal and binding agreement among the parties, as Joint Ventures, and the Owner.

5.  DUTIES ON AWARD. If the bid or proposal is accepted by the Owner, the parties shall execute such documents, with joint and